IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-571

Filed 16 April 2025

Harnett County, No. 18 JT 000017-420

In re: L.Q.


Appeal by Respondent-Father from order entered 25 October 2023 by Judge J. Frank Wood in Harnett County District Court. Heard in the Court of Appeals 18 March 2025.

> *Duncan B. McCormick for Petitioner-Appellee Harnett County Department of Social Services.*
>
> *K&L Gates, LLP, by Sophie Goodman, for Guardian ad Litem.*
>
> *Emily Sutton Dezio for Respondent-Appellant Father.*


COLLINS, Judge.

Father appeals the termination of his parental rights to his minor child, Lou.[1] Father argues that the trial court (1) failed to conduct an Indian Child Welfare Act ("ICWA") inquiry at the commencement of the action terminating his parental rights and (2) violated Father's due process rights when it failed to comply with N.C. Gen. Stat. § 7B-1109(d) and continued this case for more than ninety days before holding an initial termination of parental rights hearing. We find no merit in these

---

[1] We use a pseudonym to protect the identity of the minor child. *See* N.C. R. App. P. 42.

arguments and affirm the trial court's order.

## I.    Background

Mother and Father are the biological parents of Lou, a minor child born in July 2017. Mother and Father were never married but had an on-and-off relationship that produced two children. Mother also had two other children with two other fathers; those children were adjudicated neglected and dependent in 2016.[2] Johnston County Department of Social Services ("DSS") became involved with Mother and Father in 2016 because of a history of domestic violence, substance abuse issues, and concerns for untreated mental health issues for both Mother and Father. In light of this history, DSS again became involved with the family shortly after Lou's birth due to concerns for his wellbeing. Father was in jail at the time of Lou's birth, and DSS formulated a case plan for him to begin upon his release. DSS noted that, prior to going to jail, Father: did not have stable housing; did not cooperate with DSS; refused to address the allegations of substance abuse; refused to take drug tests; acknowledged his history of domestic violence; violated safety assessments put in place by DSS; failed to attend psychological evaluations and counseling appointments; and "engaged in criminal activity resulting in new criminal charges."

On 29 January 2018, DSS filed a petition alleging that Lou was neglected and took nonsecure custody of Lou that same day. On 27 April 2018, the trial court

---

[2] Mother is not a party to this appeal, and Lou's siblings are not subjects of this appeal.

entered its adjudication order, finding in relevant part that it had "inquired of the participants with respect to possible Indian heritage," that "[t]he participants are not reporting any Indian heritage," and that Father "is not a member of an Indian tribe." The trial court found that: Father was in jail at the time of the filing of the petition and remained in jail as of the time of the adjudication hearing; Lou did not receive proper care, supervision, or discipline; Lou lived in an environment injurious to his welfare prior to the filing of the petition; and Lou was exposed to a substantial risk of physical, mental, or emotional impairment prior to the filing of the petition. The trial court concluded that Lou was a neglected juvenile as defined by N.C. Gen. Stat. § 7B-101(15), and it moved to the disposition phase of the hearing.

During the disposition phase, the trial court found that Father was still incarcerated, and it was not in Lou's best interest to "award a minimum period or frequency of visitation to [Father] while he is in jail." The trial court ordered that Father enter into and comply with a services agreement with DSS, which included notifying DSS of his release from jail; obtaining a substance abuse assessment; complying with substance abuse treatment; completing random drug screens; enrolling in parenting classes; completing domestic violence prevention classes; and participating in "any relevant programs and services available to him while in jail or prison." The trial court found that it was in Lou's best interest to remain in DSS custody and scheduled a permanency planning hearing for July 2018.

In a permanency planning review order entered on 8 March 2019, the trial

court found that Father was released from jail in September 2018, had not made any progress on his case plan, and was "now jailed in Johnston County." The trial court concluded that it was in Lou's best interest to remain in DSS custody, and it was not in Lou's best interest to visit with Father. The trial court again directed Father to comply with his case plan with DSS and scheduled a permanency planning review hearing for 5 April 2019.

In a permanency planning review order entered on 28 June 2019, the trial court again found that Father had not made any progress on his case plan and that he was "now jailed in a county jail" and "has pending criminal charges." The trial court found that "[c]ontinued reunification efforts clearly would be unsuccessful with . . . [Father]. Reunification efforts should be ceased." The trial court concluded that it was in Lou's best interest to remain in DSS custody and that Lou's primary permanent plan should be adoption, and it scheduled a permanency planning review hearing for 4 October 2019.

In a permanency planning review order entered on 8 May 2020, the trial court found that Father "maintained contact with DSS" and "contacted DSS following his release from incarceration," but that Father "has not made or documented significant progress since the [last permanency planning review] hearing." The trial court found that Father was not actively participating in his case plan or cooperating with the plan, DSS or the guardian ad litem. The trial court again found that reunification efforts between Lou and Father would be unsuccessful. The trial court concluded that

it was in Lou's best interest to remain in DSS custody and that Lou's primary permanent plan should be adoption, and it scheduled a permanency planning review hearing for 14 August 2020.

On 5 August 2020, DSS filed a petition to terminate Father's parental rights to Lou ("TPR Petition"). DSS alleged that Father's rights should be terminated on the grounds of neglect; willfully failing to make reasonable progress in correcting the conditions which led to Lou's removal; willfully failing to pay a reasonable portion of the cost of care; abandonment; and a prior involuntary termination of Father's parental rights to another child. In the TPR Petition, DSS alleged that Lou "is not an Indian child for the purposes of the Indian Child Welfare Act." Father did not file a response to the TPR Petition.

Between the filing of the TPR Petition and the first hearing on the TPR Petition on 11 March 2022, the trial court entered twelve continuance orders due to various reasons including Father becoming ill, attorneys and court staff contracting COVID-19, and the Court's heavy docket due to COVID-19. No one objected to any of the continuances.

On 11 March 2022, the TPR Petition came on for hearing. During the pre-trial hearing, DSS stated, "[T]he department is not aware of any American Indian heritage or any native American Indian heritage. This case is old enough to where I don't recall what findings were made then, but I believe inquiries were made. . . . We would ask that all participants indicate that they're aware of any American Indian

heritage." The trial court asked whether anyone was "aware of any tribal affiliation or any American Indian heritage," and Father's attorney responded, "[Father] informs me his grandmother is Blackfoot Indian." DSS then called Elaine Coley, a worker with DSS, to the stand for direct examination. Coley testified that she was not aware of any possible American Indian heritage with respect to Lou or his parents and that she had not been given any indication that Lou or his parents had "any kind of tribal affiliation." On cross-examination, Father's attorney asked Coley if she ever asked about "whether there was any Indian heritage from [Father]." Coley responded:

> We always, in the very beginning. That's one of the things that we have to look into if there is any possibility of Indian heritage. I can't say if I asked myself or if the CPS worker would have asked, but that's something that we thought very early on about Indian heritage.

The trial court continued the hearing to 25 March 2022, at which point it moved to the adjudication phase of the hearing. DSS called Father as a witness and he testified that he had possible "Blackfoot" heritage and that his grandmother's "mama's mama's mama" was "Blackfoot." Father testified that she never showed him any documentation or identification card showing that she was a member of the tribe and that none of his other relatives indicated that they were members of the tribe. On cross-examination by his attorney, Father testified that he had been told he was a member of the "Blackfoot" tribe and had believed that since he was sixteen years old. He also testified that DSS never asked him about Indian heritage. The trial

court continued the adjudicatory hearing until 8 April 2022.

At the 8 April 2022 session, Father called his paternal aunt as a witness; Father's attorney asked her about a possible relationship to the "Blackfoot" tribe, and she testified that the only thing she knew was that Father's paternal grandmother was "100 percent Cherokee Indian." Father's aunt was not sure whether Father's paternal grandmother was a member of the Cherokee tribe and testified that she did not have a membership or any documentation to show that she was part of the Cherokee tribe. Father's aunt did not recall any mention of the "Blackfoot" tribe and did not recall any mention of any other tribes.

Father was called to the stand again as a witness, and DSS asked him on cross-examination whether he had heard of any Cherokee heritage. Father testified, "I'm just going to be honest. The reason why I said Blackfoot because I remember when I was 16, my grandmama and everybody, you know, they come to my grandmama house and communicate, socialize. And my grandmama said something about, you know, Blackfoot tribe, so that stuck with me. I didn't know about Cherokee." The trial court continued the hearing until 22 April 2022.

On 22 April 2022, the trial court moved to the disposition phase of the hearing and explained that it was ready to give findings for all issues "except for the native American finding." DSS explained that it was "still waiting" for "letters from the tribes" of Blackfeet and Cherokee. The trial court stated, "I'm going to go ahead and give you findings, but this is all subject to receiving documentation back from the

letters that we sent to the tribe. The Court would hold the evidence open for any final determination regarding the tribal affiliation or none thereof."

Over the following seven months, DSS waited to hear back from the three federally recognized Cherokee bands and the federally recognized Blackfeet tribe. On 28 July 2022, the Cherokee Nation indicated that Lou was "not an Indian Child" in relation to Cherokee Nation. On 28 July 2022, the Eastern Band of Cherokee Indians indicated that Lou was "not an Indian Child" as to the Eastern Band of Cherokee Indians. On 20 September 2022, the Blackfeet tribe indicated that Lou was "not an Indian Child" as to the Blackfeet. On 21 November 2022, the United Keetoowah Band of Cherokee Indians indicated that Lou was "not an Indian Child" in relation to the United Keetoowah Band of Cherokee Indians. On 18 April 2023, the trial court held a hearing for "tribal affiliation discussions," and DSS entered the tribal information and responses into evidence without objection.

On 25 October 2023, the trial court entered its order terminating Father's parental rights. The Court found that: it had inquired of the participants as to possible Indian heritage; Father and his aunt were told about possible family connections to Indian tribes; Father described a possible connection to the "Blackfoot" tribe and his aunt described a possible connection to the Cherokee tribe; Father and his aunt did not have any information other than what they had been told by paternal relatives; and Father and his aunt were not members of any tribes. The trial court then found that Lou was not an "Indian Child" in relation to the Blackfeet tribe or

any three of the Cherokee bands and concluded that Lou was not an "Indian Child" for purposes of ICWA.

The trial court concluded that grounds existed to terminate Father's parental rights on the grounds of neglect; willfully leaving Lou in foster care for more than twelve months without showing reasonable progress in correcting the conditions which led to Lou's removal; and prior involuntary termination of Father's parental rights to another child. The trial court further concluded that it was in Lou's best interest to terminate Father's parental rights. Father filed his notice of appeal on 25 January 2024.[3]

## II.    Discussion

Father argues that (1) the "[t]rial [c]ourt's failure to conduct an ICWA inquiry at the commencement of the action violated [Father's] due process rights," and (2) the trial court violated his due process rights when it failed to comply with N.C. Gen. Stat. § 7B-1109(d) and continued this case for more than ninety days before holding an initial termination of parental rights hearing.

**1. ICWA**

---

[3] Father filed a petition for writ of certiorari with this Court on 3 September 2024, explaining that the order terminating Father's parental rights was entered on 25 October 2023, that there is no certificate of service indicating when DSS served Father with the order, and that Father received "actual notice" of the order on 6 December 2023. Father signed his Notice of Appeal with his attorney on 22 December 2023 but, due to miscommunication in his attorney's office and the Christmas holidays, Father's notice of appeal was not filed until 25 January 2024. Father states that his notice of appeal was untimely, as it was filed more than 30 days after the order was entered and after he received actual notice of the order, and he asks this Court to grant his petition for writ of certiorari and reach the merits of the appeal. We grant Father's petition for writ of certiorari.

The issue of whether a trial court complied with ICWA requirements is reviewed de novo. *See In re A.P.*, 260 N.C. App. 540, 542-46 (2018). Under de novo review, this Court "considers the matter anew and freely substitutes its own judgement for that of the trial court." *In re M.R.F.*, 378 N.C. 638, 641 (2021) (quotation marks, brackets, and citations omitted).

Congress enacted ICWA "to establish the 'minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes' in order to 'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.'" *In re A.P.*, 260 N.C. App. at 542-43 (quoting 25 U.S.C. § 1902).

Subsection 23.107(a) of Title 25 of the Code of Federal Regulations provides that "[s]tate courts must ask each participant in an . . . involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on the record." 25 C.F.R. § 23.107(a) (2024).

An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4) (2023). The relevant inquiry is whether the child has a political affiliation with a federally recognized Indian tribe. *In re C.C.G.*, 380 N.C. 23, 29 (2022). "Indian heritage, which is racial, cultural, or hereditary does not indicate Indian tribe

membership, which is political." *Id*. at 30; *see* 25 U.S.C. § 1903(4).

A trial court has reason to know an Indian child is involved in a proceeding if: "Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[.]" 25 C.F.R. § 23.107(c)(2) (2024). When a trial court has reason to know that a child could be an Indian child, but does not have conclusive evidence, the trial court should confirm and "work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact a member . . . ." 25 C.F.R. § 23.107(b)(1) (2024).

When a trial court knows or has reason to know that an Indian child is involved in an involuntary custody proceeding, federal law provides:

> [T]he party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe . . . .

25 U.S.C. § 1912(a) (2023).

This Court has "required social service agencies to send notice to the claimed tribes rather than risk the trial court's orders being voided in the future, when claims of Indian heritage arise, even where it may be unlikely the juvenile is an Indian

child." *In re A.P.*, 260 N.C. App. at 545 (citations omitted).

Here, the parties do not dispute that the trial court inquired about Lou's possible Indian heritage, nor that, when the trial court had reason to know that Lou may be an Indian child, DSS properly notified the relevant tribes and each tribe confirmed that Lou is not an eligible member.

Father does dispute, however, whether this inquiry was made at the commencement of the termination of parental rights proceedings, and thus whether it was proper under ICWA. The trial court inquired about Lou's potential membership in an Indian tribe at the pre-trial hearing on 11 March 2022. This hearing took place following twelve continuances beginning on 5 September 2020. All twelve continuances were caused by either COVID-19 exposures and regulations, Father's inability to be present, Mother's inability to be present, or a heavy docket. Father argues that, due to the twelve continuances over seventeen months, the inquiry into Lou's possible Indian heritage did not occur at the commencement of proceedings, as is required by 25 C.F.R. § 23.107(a). We disagree.

The record indicates that the 11 March 2022 pre-trial hearing was the first opportunity for the trial court to make an inquiry into Lou's possible Indian heritage. At the start of the pre-trial hearing, the court asked the parties if "[a]nybody [was] aware of any tribal affiliation or any American Indian heritage?" DSS was not aware of any possible Indian heritage. Father's counsel responded, stating that Father's grandmother is "Blackfoot Indian." At subsequent hearings, the court heard

testimony on potential Indian heritage from Father, Mother, Father's paternal aunt, and a social worker. Father stated that his paternal grandmother was "Blackfoot" Indian, while his paternal aunt indicated that she was told the paternal grandmother was Cherokee Indian. No documentation of tribal affiliation was presented at trial. After being given reason to know Lou may be an Indian child, DSS properly notified and received responses from the Blackfeet Tribe, the Cherokee Nation, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians indicating that Lou is not an Indian child.

The record reflects that the trial court properly made the inquiry required by 25 C.F.R. § 23.107(a) at the commencement of the termination of parental rights proceedings and subsequently notified and received responses from the relevant tribes. Therefore, the trial court complied with ICWA.

**2. N.C. Gen. Stat. § 7B-1109**

Father argues that the trial court violated his due process rights when it failed to comply with N.C. Gen. Stat. § 7B-1109(d) and continued this case for more than ninety days before holding an initial hearing on the petition to terminate his parental rights. Father acknowledges that filing a writ of mandamus is the appropriate remedy for the trial court's failure to hold a timely hearing on a petition to terminate parental rights. However, Father argues that, "considering the time-frames established by the juvenile code for the expeditious resolution of these matters," the trial court "should have moved this case to its conclusion within a reasonable amount

of time." We are not persuaded.

This Court reviews whether a trial court complied with N.C. Gen. Stat. § 7B-1109 de novo on appeal. *In re C.V.D.C.*, 374 N.C. 525, 530 (2020).

A writ of mandamus is the proper remedy when the trial court fails to hold a hearing or enter an order as required by statute. *See In re C.R.L.*, 377 N.C. 24, 28 (2021). "A writ of mandamus ensures that the trial courts adhere to statutory time frames without the ensuing delay of a lengthy appeal." *In re T.H.T.*, 362 N.C. 446, 455 (2008). "Moreover, the availability of the remedy of mandamus ensures that the parties remain actively engaged in the district court process and do not 'sit back' and rely upon an appeal to cure all wrongs." *Id.* at 455-56 (citations omitted).

In *In re C.R.L.*, the parent argued that a thirty-three month span between the filing of a termination of parental rights petition and the termination hearing was so egregious a violation of N.C. Gen. Stat. § 7B-1109 that it should be considered "presumptively prejudicial." 377 N.C. at 28. Our Supreme Court held that the appellant's failure to petition for writ of mandamus precluded him from obtaining relief from the violation of N.C. Gen. Stat. § 7B-1109. *Id.* at 29.

Here, as in *C.R.L.*, Father failed to file a petition for writ of mandamus at any point between the filing of the TPR Petition and the conclusion of proceedings to terminate his parental rights. Also like in *C.R.L.*, Father offered no explanation for his failure to file a petition for writ of mandamus. Because Father "did not file a petition for writ of mandamus while the termination petitions were pending, . . . he

missed his opportunity to remedy the violation of [N.C. Gen. Stat.] § 7B-1109." *Id.*

## III.    Conclusion

The record indicates that the trial court properly inquired about Lou's potential Indian heritage at the commencement of termination of parental rights proceedings. After being given reason to know that Lou may be an Indian child within the meaning of ICWA, DSS properly notified and received responses from the relevant Indian tribes. Thus, the trial court complied with ICWA.

Father missed his opportunity to remedy the trial court's violation of N.C. Gen. Stat. § 7B-1109 by failing to file a petition for writ of mandamus during the termination of parental rights proceedings. Accordingly, we affirm the trial court's termination order.

AFFIRMED.

Judges STROUD and ZACHARY concur.